IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

ISHAYKA WOOD, individually, and on behalf )
of all others similarly situated, et al., )
)
Plaintiffs, )
)
v. )                          1:22-cv-1148 (LMB/IDD)
)
OMNI FINANCIAL OF NEVADA, INC., d/b/a )
Omni Financial and Omni Military Loans, )
)
Defendant. )

MEMORANDUM OPINION

Plaintiffs Staff Sergeant Ishayka Wood ("Wood") and Master Sergeant Delicia Godfrey

("Godfrey") (collectively, "plaintiffs") brought this proposed class action against defendant

Omni Financial of Nevada, Inc. ("Omni" or "defendant") for violations of the Military Lending

Act, 10 U.S.C. § 987, which was enacted to protect active duty service members and their

dependents from predatory lending practices. After the Court granted in part and denied in part

Omni's motion to dismiss the original complaint, plaintiffs filed an Amended Class Action

Complaint ("Amended Complaint"). [Dkt. No. 39]. Before the Court are Omni's Motion to

Dismiss for Lack of Jurisdiction [Dkt. No. 43] and Motion to Dismiss for Failure to State a

Claim [Dkt. No. 44]. For the reasons stated in open court and as further explained in this

Memorandum Opinion, the Motion to Dismiss for Lack of Jurisdiction will be denied, the

Motion to Dismiss for Failure to State a Claim will be granted, and the Amended Complaint will

be dismissed.

## I. BACKGROUND

### A. **Factual Background**

The Military Lending Act ("MLA"), 10 U.S.C. § 987, was enacted in 2006 in response to a report by the Department of Defense ("DOD Report") calling for the protection of active duty service members and their dependents from predatory lending practices.[1]  The DOD Report highlighted the prevalence of predatory lending practices directed toward service members, including charging usurious interest rates, extending credit without due regard for the service member's ability to repay, and encouraging extensions of outstanding loans through refinancing and loan flipping.  See DOD Report at 4-5.  The DOD Report also found that using checks, access to bank accounts, and car titles as security for obligations put "coercive pressure on military borrowers," placing their "key assets at undue risk," id. at 7, and that requiring repayment by allotment (a form of automatic payroll deduction) "pressure[d] the borrower to consider loan payments as being their top priority," id. at 44.

The DOD Report discussed the impact of these predatory lending practices on service members, finding that they failed to "help the borrower resolve their financial shortfall" and instead "trap[ped] the borrower in a cycle of debt," leaving them in "worse financial shape than when they initially contacted the lender." Id. at 3.  The DOD Report additionally observed that service members can "lose their mission effectiveness, their security clearances and their career status" as a result of debt issues.  Id. at 36; see [Dkt. No. 39] ¶ 26 (alleging that the Code of Military Conduct requires active duty service members to pay their debts, and if they fail to do so, they may lose their security clearance, job, rank, or pay).  The DOD Report concluded that

---

[1] See Department of Defense, Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents (2006), https://apps.dtic.mil/sti/pdfs/ADA521462.pdf.

"[p]redatory lending undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all volunteer fighting force." DOD Report at 53.

In response, Congress enacted the MLA, which creates disclosure obligations and imposes various lending requirements and restrictions on creditors who extend consumer credit to covered members of the armed forces, i.e., active duty service members and their dependents. See 10 U.S.C. § 987; Davidson v. United Auto Credit Corp., No. 1:20-cv-1263 (LMB/JFA), 2021 WL 2003547, at *2 (E.D. Va. May 19, 2021). The Secretary of Defense is charged with "prescrib[ing] regulations to carry out" the MLA. 10 U.S.C. § 987(h).

Omni, which does business as Omni Financial and Omni Military Loans, is an installment lender specializing in lending to active duty service members and their dependents. [Dkt. No. 39] ¶ 2. Omni has a national presence with branches near major military installations in Nevada, Tennessee, Georgia, North Carolina, Texas, Colorado, Washington, California, Virginia, Kansas, and Oklahoma. Id. ¶ 24. Omni extends 90% of its loans to active duty service members and their dependents, id. ¶ 2, and its website invites military families to apply for installment loans for "fast" funds, id. ¶ 30. Installment loans offered by Omni typically range from $500 to $10,000, and have terms ranging from six to 36 months, id. ¶ 24. Since its inception, Omni has made loans to thousands of active duty service members around the world. Id. ¶ 29. The Amended Complaint alleges that in extending loans to service members like plaintiffs, Omni has engaged in practices that violate the MLA. Id. ¶ 28.

1. Plaintiffs Staff Sergeant Ishayka Wood and Master Sergeant Delicia Godfrey

Plaintiff Wood is an E-6 Staff Sergeant in the United States Army who works for the White House Communications Agency and holds a top-secret security clearance. [Dkt. No. 39] ¶ 31. Since enlisting at the age of 17, she has used a portion of her paycheck to help her mother raise her siblings. Id. ¶ 32. Wood turned to Omni for additional funds to cover general personal,

3

household, and living expenses for herself and her family, id. ¶¶ 34-35, obtaining her first

installment loan from Omni on November 16, 2016, at Omni's branch in Colorado Springs,

Colorado, when she was stationed nearby at Fort Carson, id. ¶ 36.  Since 2016, Omni has sold

Wood at least eight installment loans, id. ¶ 35, summarized in this table in the Amended

Complaint:

<u>Omni's Loans to Plaintiff Ishayka Wood</u>

| Loan Date/ First Payment Date | Loan Term | Monthly Amount | Loan to Covered Borrower (Amount Financed) | Prepaid Finance Charge | Amount Given to Covered Borrower Directly Roll over | Amount Paid on Covered Borrower Account | Total Principal Loan Amount (alleged) | listed APR | MAPR |
|---|---|---|---|---|---|---|---|---|---|
| 11/16/16 12/31/16 | 10 | $125 | $1,053.41 | $84.27 | $1,053.41 | - | $1,137.68 | 35.705 % | 54.260% |
| 1/5/17 2/28/17 | 23 | $125 | $2,110.42 | $85.44 | $1,067.94 | $1,042.48 | $2,195.86 | 30.557 % | 35.345% |
| 8/15/17 9/30/17 | 15 | $190 | $2,320.25 | $43.71 | $546.35 | $1,773.90 | $2,363.96 | 30.132 % | 33.203% |
| 5/18/18 6/30/18 | 11 | $190 | $1,768.13 | $42.93 | $536.57 | $1,231.56 | $1,811.06 | 32.322 % | 37.354% |
| 11/14/18 12/31/18 | 20 | $200 | $3,127.99 | $250.24 | $3,127.99 | - | $3,378.23 | 28.055 % | 38.257% |
| 10/23/19 11/30/19 | 15 | $250 | $3,109.74 | $248.78 | $3,109.74 | - | $3,358.52 | 28.250 % | 41.656% |
| 9/8/21 9/30/21 | 36 | $265 | $5,834.75 | $150.00 | $5,834.75 | - | $5,984.75 | 35.945 % | 38.156% |
| 4/8/22 4/30/22 | 36 | $265 | $5,834.59 | $150.00 | $621.35 | $5,213.24 | $5,984.59 | 35.947 % | 38.074% |

Id. ¶ 38.

Plaintiff Godfrey is an E-8 Master Sergeant in the United States Army who works in

Army Human Resources.  Id. ¶ 55.  Godfrey held a top-secret security clearance "until she fell

behind on an installment loan similar to the one at issue in this lawsuit," and as a result of

collections proceedings, she lost her security clearance and was prohibited from further career

advancement in the Army.  Id.  Godfrey first received a loan from Omni when she needed funds

to purchase a flight to Nigeria to attend a family funeral.  Id. ¶¶ 56-58.  "[O]ver the last five

years," Omni has sold Godfrey "at least six (6) installment loans," and she repaid her "final

loan," which was obtained on December 22, 2016, on January 4, 2019.  Id. ¶ 57 & n.18; see

[Dkt. No. 39-2] at 4.  No other dates are available for Godfrey's loans because she is "not in possession of any of her loan documents" besides those for her December 22, 2016 loan.  [Dkt. No. 39] ¶ 57 n.19.

    2. <u>Alleged MLA Violations</u>

The MLA's protections apply to "covered members," their "dependents," and/or "covered borrowers."  [Dkt. No. 39] ¶ 87; <u>see</u> 10 U.S.C. § 987.  Under the MLA, a "covered member" is a "member of the armed forces who is—(A) on active duty under a call or order that does not specify a period of 30 days or less; or (B) on active Guard and Reserve Duty."  10 U.S.C. § 987(i)(1).  A "covered borrower" is a "consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a covered member . . . or a dependent . . . of a covered member."  32 C.F.R. § 232.3(g)(1).  The Amended Complaint alleges that Wood and Godfrey are "covered members" and "covered borrowers" under the MLA because they are active duty service members who were obligated to repay consumer loans extended to them by Omni.  [Dkt. No. 39] ¶¶ 87-88.

A "creditor" is defined by the MLA as a person who "(i) is engaged in the business of extending consumer credit; and (ii) meets such additional criteria as are specified for such purpose in regulations prescribed under this section[.]"  10 U.S.C. § 987(i)(5)(A); <u>see</u> 32 C.F.R. § 232(i).  Therefore, unless the MLA's implementing regulations provide additional criteria which Omni does not meet, Omni is a creditor under the MLA.  The Amended Complaint describes the installment loans extended to Wood and Godfrey as "consumer credit" subject to the MLA because they are "credit offered or extended to a covered borrower primarily for personal, family, or household purposes" and are subject to a finance charge and payable by written agreement in more than four installments.  32 C.F.R. § 232.3(f)(1); 10 U.S.C. § 987(i)(6).

The Amended Complaint alleges that Omni's installment loans violated the MLA in four ways. First, the MLA prohibits a creditor from extending consumer credit with a military annual percentage rate of interest ("MAPR") greater than 36%. 10 U.S.C. § 987(b); 32 C.F.R. § 232.4(b). The Amended Complaint alleges that Omni's standard form Repayment Agreement and Disclosure Form miscalculated the disclosed MAPR by excluding the prepaid finance charge due for each loan, [Dkt. No. 39] ¶¶ 134-37, and that "[b]ased upon reasonable investigation and calculation conducted by a reliable expert," the MAPR for six of Wood's loans exceeded the 36% interest rate cap, id. ¶¶ 38, 48.

Second, the MLA prohibits an extension of consumer credit to covered members where "the creditor rolls over, renews, repays, refinances, or consolidates any consumer credit extended to the borrower by the same creditor with the proceeds of other credit extended to the same covered member or a dependent." 10 U.S.C. § 987(e)(1). The Amended Complaint alleges that Omni extended loans to Wood, dated January 5, 2017, August 15, 2017, May 18, 2018, and April 8, 2022,[2] that involved unlawful refinancing as they included amounts that were used to pay off prior loans. [Dkt. No. 39] ¶¶ 41-42, 48, 157-58. As for Godfrey's loans, the Amended Complaint alleges that Godfrey's December 22, 2016 loan involved roll overs of prior loans from Omni. Id. ¶ 159.

Third, the MLA prohibits extending consumer credit that "requires as a condition for the extension of credit that the borrower establish an allotment to repay an obligation." 10 U.S.C. § 987(e)(6). The military allotment system is run by the Department of Defense and enables a

---

[2] The Complaint and Amended Complaint allege that Wood obtained a loan from Omni on April 8, 2022; however, the loan documents that Wood attached to the Complaint indicated that the loan was actually obtained on April 6, 2022. See [Dkt. No. 1-2] at 9. Nevertheless, for the sake of consistency, the Memorandum Opinion refers to the loan as the April 8, 2022 loan.

service member to designate a portion of each paycheck to certain recipients to facilitate the payment of recurring obligations. See Department of Defense Financial Management Regulation, DOD 7000.14-R, vol. 7A, ch. 40 (Apr. 2022). The Amended Complaint alleges that before December 30, 2020, Omni required plaintiffs to agree to repayment by allotment, with backup preauthorized electronic fund transfer, as a condition for receiving their loans, [Dkt. No. 39] ¶¶ 166-83, and that after December 30, 2020, Omni gave Wood two repayment options, to either repay by preauthorized electronic fund transfer using the bank account into which her monthly salary was deposited or repay by allotment, id. ¶¶ 188-89.

Fourth, the MLA prohibits a creditor from "us[ing] a check or other method of access to a deposit, savings, or other financial account maintained by the borrower, or the title of a vehicle as security for the obligation." 10 U.S.C. § 987(e)(5). The Amended Complaint alleges that for all eight of Wood's loans and at least one of Godfrey's loans, Omni required them to provide a security interest in their bank accounts as a condition for receiving the loans. [Dkt. No. 39] ¶¶ 204-12.

The MLA provides for various enforcement mechanisms. First, a creditor who "knowingly violates" the MLA can be charged criminally with a misdemeanor. 10 U.S.C. § 987(f)(1). Second, the MLA, as amended in 2013, allows covered members to sue anyone who violates the MLA for actual damages "not less than $500 for each violation," punitive damages, attorneys' fees, and costs. Id. § 987(f)(5). Moreover, under the MLA, "[a]ny credit agreement, promissory note, or other contract prohibited under this section is void from the inception of such contract." Id. § 987(f)(3). Federal agencies that are charged with enforcing the Truth in Lending Act, such as the Consumer Financial Protection Bureau ("CFPB"), are also empowered to enforce the MLA. Id. § 987(f)(6); see 15 U.S.C. § 1607.

3. The CFPB Proceedings

Omni was recently the subject of a CFPB investigation for violations of the MLA, as well

as the Electronic Fund Transfer Act, 15 U.S.C. § 1693 et seq., and the Consumer Financial

Protection Act, 12 U.S.C. § 5536. [Dkt. No. 39] ¶ 104. On December 21, 2020, Omni stipulated

to a Consent Order to resolve the CFPB's enforcement action ("CFPB Consent Order"). Id.

¶ 105; see [Dkt. No. 39-1] (Consent Order). Specifically, the CFPB found that Omni violated

the MLA, 10 U.S.C. § 987(e)(6), because Omni employees told covered members that to obtain a

loan they had to repay by allotment. Id. ¶¶ 10-13. The CFPB determined that 99% of covered

members who obtained loans from Omni repaid their loans by allotment, and that Omni

benefitted from this practice because repayment by allotment helped "guarantee payment on

unsecured loans"; however, service members were harmed by mandatory allotment "because

they were wrongfully deprived of the option to pay by means other than allotment." Id. ¶¶ 11-

12. The CFPB also found that Omni violated the Electronic Fund Transfer Act, 15 U.S.C.

§ 1693k(1), by requiring that every borrower provide bank account and routing information and

preauthorize Omni to initiate an electronic fund transfer from that bank account on the scheduled

payment date in the event of a default under the primary payment method. Id. ¶¶ 15-18. Finally,

the CFPB concluded that Omni violated the Consumer Financial Protection Act, 12 U.S.C.

§ 5536(a)(1)(A), by offering a consumer financial product or service that was not in conformity

with a federal consumer-financial law, namely the Electronic Fund Transfer Act. Id. ¶¶ 19-22.

To remedy these violations, the Consent Order enjoined Omni from conditioning future

loans to covered members on repayment by allotment or preauthorized electronic fund transfer;

required Omni to inform existing borrowers of the ability to repay using different methods;

precluded Omni from drafting bank accounts by preauthorized electronic fund transfer or

accepting repayment by allotment unless specifically authorized by the borrower after Omni

disclosed that these methods were optional; required Omni to train its loan origination employees

that repayment by allotment was optional; and prohibited Omni from incentivizing employees to

obtain allotment authorization or considering the number or rate of customers who elected to pay

by allotment when evaluating employee performance. See [Dkt. No. 39] ¶ 108; Consent Order

¶¶ 23-28. Omni was also required to pay a civil monetary penalty of $2,175,000 to the CFPB.

Id. ¶ 36. No monetary relief was afforded to covered members harmed by Omni's violations of

the MLA or Electronic Fund Transfer Act, [Dkt. No. 39] ¶ 109; however, in the event that a

related private action was brought against Omni, the Consent Order prohibited Omni from

claiming an offset or reduction of any compensatory monetary remedies based on the monetary

penalty paid to the CFPB, see Consent Order ¶ 40.

### B.  Procedural History

On October 12, 2022, plaintiff Wood filed a four-count Class Action Complaint

("Complaint") against Omni to "fill the void left by the CFPB Consent Order by obtaining

necessary actual damages, declaratory and injunctive relief for service members and their

dependents like [p]laintiff and the [c]lass" for Omni's violations of the MLA.  [Dkt. No. 1] ¶ 61.

Count I alleged a violation of the MLA's prohibition on charging interest rates in excess of 36%

MAPR, 10 U.S.C. § 987(b) (the "Interest Rate Claim").  Count II alleged a violation of the

MLA's prohibition on loan roll overs and refinancing, 10 U.S.C. § 987(e)(1) (the "Roll Over

Claim").  Count III alleged that Omni violated the MLA, 10 U.S.C. § 987(e)(6), 32 C.F.R. §

232.8(g), by requiring repayment by allotment or preauthorized electronic fund transfer as a

condition for obtaining a loan (the "Allotment Claim").  Count IV alleged that Omni violated the

MLA, 10 U.S.C. § 987(e)(5), 32 C.F.R. § 232.8(e)(3), by conditioning the extension of consumer

credit upon the borrower identifying a bank account to be used as a security interest (the

"Security Interest Claim").  Wood sought to certify a class covering the five years preceding the

9

date this civil action was filed, consisting of four subclasses each representing one of the alleged

MLA violations.

On November 23, 2022, defendant moved to dismiss the Complaint for lack of standing

and for failure to state a claim upon which relief may be granted.  [Dkt. Nos. 15, 16].  Defendant

also filed a motion to strike the class action allegations as meritless and the allegations about the

CFPB Consent Order as unduly prejudicial.  [Dkt. No. 18].  On January 20, 2023, the Court

denied defendant's motion to dismiss for lack of standing and granted in part and denied in part

defendant's motion to dismiss for failure to state a claim.  [Dkt. No. 36].  The Court found that

many of the alleged MLA violations appeared to be time-barred, but at the insistence of

plaintiffs' counsel agreed to permit Wood to replead the statute of limitations issue, along with

all four MLA violations.  Id.  The Court also denied defendant's motion to strike the class action

allegations and references to the CFPB Consent Order.  Id.

On February 3, 2023, plaintiffs filed the Amended Complaint, which added Godfrey as a

named plaintiff and alleged the same four violations of the MLA as the original Complaint: the

Interest Rate Claim (Count I), the Roll Over Claim (Count II), the Allotment Claim (Count III),

and the Security Interest Claim (Count IV).[3]  [Dkt. No. 39].  Plaintiffs seek rescission of the

loans, reimbursement of the total interest paid, damages of not less than $500 for each violation,

punitive damages, and injunctive relief.  On February 17, 2023, defendant filed a Motion to

---

[3] The Amended Complaint defines the proposed classes as: "All MLA covered borrowers in the
United States that entered into an Omni Repayment Agreement in substantially the same form as
Plaintiffs and where one of the following were part of the transaction: (1) the MAPR was above
36% (The Interest Rate Class); (2) the loan proceeds were used to pay an earlier Omni loan that
Omni extended to the same Covered Borrower (The Roll-Over Class); (3) Omni conditioned the
loan on the borrower establishing an allotment (The Allotment Class); (4) Omni conditioned the
loan on the borrower giving Omni a security interest in his or her bank account (The Security
Interest Class)."  [Dkt. No. 39] ¶ 120.

Dismiss for Lack of Jurisdiction [Dkt. No. 43] and a Motion to Dismiss for Failure to State a Claim [Dkt. No. 44].

On March 2, 2023, the day before plaintiffs' response to defendant's motions to dismiss was due, the parties filed a Joint Motion for Entry of a Consent Order Granting Plaintiffs Leave to File a Second Amended Complaint, [Dkt. No. 52], in which plaintiffs moved to file a Second Amended Complaint that would "dismiss[] Count I of the First Amended Complaint, 10 U.S.C. § 987(b) (The Interest Rate Claim)" and not add any new claims, and requested a new briefing schedule as to any motion to dismiss filed by defendant in response to the Second Amended Complaint, [Dkt. No. 53]. The Joint Motion explained that "the [p]arties dispute the validity and strength of Count I of the Amended Complaint," the Interest Rate Claim, which is "the subject of substantial discovery and expert testimony," and plaintiffs believe that they and the putative class "will be best served by directly focusing their efforts on the remaining counts of the First Amended Complaint: Counts II through IV." Id. ¶¶ 6-8.

On March 3, 2023, the Court denied the motion for leave to amend, finding that there was no need for plaintiffs to file a Second Amended Complaint because they could make the requested amendment by voluntarily dismissing Count I from the Amended Complaint. [Dkt. No. 55]. The Court directed plaintiffs to timely file their response to the pending motions to dismiss, and plaintiffs timely filed their Opposition. [Dkt. Nos. 56, 57, 58]. In a footnote in their Opposition memorandum, plaintiffs indicated that they "stipulate and agreed to the dismissal of Count I, which the Parties negotiated to materially streamline ongoing discovery" [Dkt. No. 58-1] at 2 n.2, and therefore the Interest Rate Claim will be dismissed without prejudice. Defendant's motions to dismiss have been fully briefed and oral argument has been held.

11

## II. DISCUSSION

Defendant has moved to dismiss the Amended Complaint under Rule 12(b)(1) for lack of standing and under Rule 12(b)(6) for failure to state a plausible claim for relief. In resolving defendant's motions, the Court will first evaluate whether plaintiffs have constitutional standing, then turn to the MLA's statute of limitations, and finally consider whether claims that are within the statute of limitations are plausible. Because plaintiffs have stipulated to the dismissal of Count I, the Interest Rate Claim, it is no longer before the Court.

### A. **Standard of Review**

Rule 12(b)(1) requires that a civil action be dismissed when a court lacks subject matter jurisdiction over the dispute. The plaintiff bears the burden of proving that subject matter jurisdiction exists. Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). When a defendant challenges subject matter jurisdiction on the grounds that "the complaint fails to allege sufficient facts to support subject matter jurisdiction," a court "assume[s] the truthfulness of the facts alleged." Kerns v. United States, 585 F.3d 187, 193 (4th Cir. 2009). When a defendant "challenges the veracity of the facts underpinning subject matter jurisdiction," a court may consider evidence outside the complaint to determine whether there are facts that support jurisdiction "without converting the motion to a summary judgment proceeding." Id. at 192.

Rule 12(b)(6) requires that a complaint be dismissed when it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To survive a motion to dismiss, a complaint must allege enough facts "to raise a right to relief above the speculative level." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Twombly, 550 U.S. at 555). "Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." Id. (quoting Iqbal, 556 U.S. at 679).

12

### B. <u>Standing</u>

Omni argues that plaintiffs lack standing to challenge Omni's violations of the MLA because they have not suffered any concrete injury from Omni refinancing their loans, requiring them to agree to repayment by allotment, or taking a security interest in their bank accounts.

The doctrine of standing is "rooted in the traditional understanding of a case or controversy" under Article III of the Constitution, and it "'serves to prevent the judicial process from being used to usurp the powers of the political branches' . . . and confines the federal courts to a properly judicial role." <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 338 (2016) (quoting <u>Clapper v. Amnesty Int'l USA</u>, 568 U.S. 398, 408 (2013)). To establish standing, a plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." <u>TransUnion LLC v. Ramirez</u>, 141 S. Ct. 2190, 2203 (2021) (citing <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560-61 (1992)). At the pleading stage, a plaintiff must "clearly . . . allege facts demonstrating" each element of standing. <u>Warth v. Seldin</u>, 422 U.S. 490, 518 (1975).

Specifically at issue in this civil action is the "concreteness" element of an injury-in-fact, which requires that an injury "must actually exist"—it must be "'real,' and not 'abstract.'" <u>Spokeo</u>, 578 U.S. at 340. "[O]bvious" concrete injuries include "tangible harms, such as physical harms and monetary harms" caused by a defendant. <u>Ramirez</u>, 141 S. Ct. at 2204. "[I]ntangible harms can also be concrete," and "[c]hief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts." <u>Id.</u> Although the concreteness inquiry "asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury," "an exact duplicate in American history and tradition" is not required. <u>Id.</u> Moreover, in both <u>Spokeo</u> and <u>Ramirez</u>, the Supreme

Court made clear that although Congress may "elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law," and courts must afford due respect to Congress's decision to grant plaintiffs a cause of action to sue over a statutory violation, Congress "may not . . . transform something that is not remotely harmful into something that is." Id. at 2204-05; Spokeo, 578 U.S. at 341.  Therefore, "[t]he intangible harm of enduring a statutory violation, standing alone, typically [will not] suffice under Article III— unless there[] [is] separate harm (or a materially increased risk of another harm) associated with the violation." O'Leary v. TrustedID, Inc., 60 F.4th 240, 243 (4th Cir. 2023).

Omni argues that under the allegations in the Amended Complaint, plaintiffs have been harmed only by technical violations of the MLA and have not suffered any concrete injury sufficient to establish an injury-in-fact.  Plaintiffs counter that they have been injured from Omni's MLA violations having made payments, including interest payments, on loans that were "void from [their] inception," 10 U.S.C. § 987(f)(3), due to their unlawful refinancing, allotment, and security interest requirements.  [Dkt. No. 56] at 2.  Plaintiffs contend that because the loans were void from inception, the interest payments they made were never actually owed and due and therefore they suffered a monetary injury that satisfies the concreteness requirement of an injury-in-fact.

The Supreme Court reiterated in Ramirez that "monetary harms" "readily qualify as concrete injuries under Article III," and thus "[i]f a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."  141 S. Ct. at 2204.  Plaintiffs point to two post-Spokeo decisions by circuit courts of appeals which support their position that the payment of money on a contract that is void constitutes a concrete injury. In Graham v. Catamaran Health Solutions, LLC, 940 F.3d 401 (8th Cir. 2017), the Eighth Circuit

found that a plaintiff suffered a "compensable economic injury" by paying premiums on a group insurance policy that was "void <u>ab initio</u> due to non-compliance with state law" that governed permissible and qualifying group insurance policies. <u>Id.</u> at 408.  Likewise, in <u>Dubuisson v. Stonebridge Life Insurance Company</u>, 887 F.3d 567 (2d Cir. 2018), the Second Circuit concluded that the plaintiffs had articulated a "concrete, economic injury" from having "paid premiums for disability and medical expense insurance policies that are illegal under New York law and are therefore void <u>ab initio</u> or, in the alternative, voidable." <u>Id.</u> at 574-75.  In <u>Dubuisson</u>, the plaintiffs claimed that the group insurance policies were illegal because they were not issued to eligible entities under New York insurance law and had not been approved by state regulators, and the Second Circuit held that the plaintiffs "articulated a concrete economic injury: payment of premiums on a void or voidable insurance policy." <u>Id.</u> at 574.  Importantly, the court found it immaterial for Article III standing that the plaintiffs "did not suffer qualifying losses or make claims for coverage under their policies," <u>id.</u> at 571, and that New York law nevertheless recognized illegal policies as valid and enforceable (meaning that the plaintiffs could still receive coverage for eligible claims).

　　<u>Graham</u> and <u>Dubuisson</u> are analogous to the Amended Complaint because both the insurance policies at issue in those cases were allegedly void due to noncompliance with state law, whereas here, plaintiffs allege that their loans were void due to noncompliance with the MLA.  Although defendant correctly points out that <u>Spokeo</u> and <u>Ramirez</u> make clear that a bare statutory violation does not constitute an injury-in-fact, plaintiffs' theory of injury is not a bare statutory violation of the MLA, but rather a resulting economic injury: essentially, they made payments on loans that they should not have had to pay interest on because the loans were void

from inception under federal law, and the loans should never have been issued with the unlawful conditions.  That is a sufficient concrete injury.

Omni has identified an unreported case from the Southern District of Florida addressing whether a plaintiff had Article III standing to challenge the disclosure of an inaccurate MAPR and the inclusion of an arbitration provision in a loan agreement, both of which allegedly violated the MLA.  See Louis v. Bluegreen Vacations Unlimited, Inc., No. 1:21-cv-61938, 2022 WL 2340958, at *6 (S.D. Fla. May 13, 2022), report and recommendation adopted, 2022 WL 1793058, at *2 (S.D. Fla. June 1, 2022).  In Louis, the court found that the procedural violations of the MLA which rendered the loan agreements void were insufficient to confer Article III standing.  Id. at *6.  Like Wood and Godfrey, the Louis plaintiffs argued that they suffered a concrete injury by paying money to the defendants on loans that were void under the MLA.  The court rejected that theory of injury on the grounds that the plaintiffs had "failed to allege any facts to plausibly establish any causal connection whatsoever between [p]laintiffs' payment under the contract—their alleged concrete injury—and the challenged actions of [the] [d]efendants, and they failed to allege any injury in fact that is fairly traceable to the [d]efendants' alleged violations."  Id. at *4.  Specifically, the court found that the plaintiffs did not claim that the alleged miscalculation of the MAPR, which resulted in an inaccurate interest rate disclosure but which notably did not exceed the 36% threshold (the rate was allegedly 18.097% and not 16.990% as disclosed), led them to "pay anything extra or anything different" or "would have had any bearing on their decision to accept the contract."  Id. at *5.

Here, plaintiffs assert that they have been injured by making loan payments that should never have been owed and due because the loans involved unlawful refinancing, impermissible conditioning of the loans on repayment by allotment, and a mandatory security interest in their

16

bank accounts.  The MLA violations asserted by Wood and Godfrey—unlawful repayment conditions and loan terms—are different from the violations in <u>Louis</u>, which concerned an inaccurate but not prohibited MAPR and an impermissible arbitration clause.  Whereas the court in <u>Louis</u> was not convinced that those MLA violations had anything to do with the plaintiffs making payments on the void loans, the violations at issue in this civil action are directly tied to the issuance of the loans and Wood and Godfrey's obligation to make payments on those loans.

Omni's purportedly unlawful conditions for its loans have real financial implications for plaintiffs.  As the Amended Complaint explains, mandatory allotment harms service members like Wood and Godfrey because it "limits their control over their own finances, can lead to over-indebtedness and financial distress, and can negatively impact their ability to meet other financial obligations."  [Dkt. No. 39] ¶ 194.  Plaintiffs did not specifically argue that a security interest imposes the same financial burdens on service members, but as the DOD Report identified, using access to bank accounts as a security interest puts coercive pressure on borrowers to prioritize repaying these loans and places their key assets at risk.  <u>See</u> DOD Report at 7, 44.  Finally, refinancing loans has a financial impact on plaintiffs because it extends and accumulates the amount of outstanding debt on which plaintiffs have to continue to pay interest.

In sum, the Amended Complaint sufficiently alleges that plaintiffs have suffered a concrete injury in the form of financial harm and therefore have standing to challenge Omni's violations of the MLA.  For these reasons, Omni's Motion to Dismiss for Lack of Jurisdiction will be denied.

### C. <u>Statute of Limitations</u>

A significant issue between the parties concerns the interpretation of the MLA's statute of limitations and its application to plaintiffs' loans.  The MLA provides that

17

An action for civil liability under this paragraph may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction, not later than the earlier of—

(i) two years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or

(ii) five years after the date on which the violation that is the basis for such liability occurs.

10 U.S.C. § 987(f)(5)(E).  Under this provision, the two-year period in subsection (i) runs from the accrual of the claim, which is a plaintiff's "discovery . . . of the violation," whereas the five-year period in subsection (ii) runs from the date of the violation's occurrence.  Defendant argues that six of Wood's loans which were issued more than two years before the filing of this civil action, i.e., before October 12, 2020, and all of Godfrey's loans are beyond the limitations period, and therefore Counts II, III, and IV are time-barred with respect to those loans.

The Supreme Court has interpreted "two-sentence" statutes of limitations like the MLA's by viewing the shorter period with the discovery provision as a statute of limitations and the longer period as a statute of repose.  California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc., 582 U.S. 497, 506 (2017) (explaining that "[t]he pairing of a shorter statute of limitations and a longer statute of repose is a common feature of statutory time limits").  Specifically, "[t]he two periods work together: The discovery rule gives leeway to a plaintiff who has not yet learned of a violation, while the rule of repose protects the defendant from an interminable threat of liability."  Id. (interpreting the one-year discovery provision and three-year statute of repose in 15 U.S.C. § 77m[4]); see Merck & Co. v. Reynolds, 559 U.S. 633, 650 (2010) (observing that the two-year

---

[4] 15 U.S.C. § 77m provides that an action alleging false statements in securities offerings must be brought "within one year after the discovery of the untrue statement or omission," but "[i]n no event shall any such action be brought to enforce a liability . . . more than three years after the security was bona fide offered to the public, or . . . more than three years after the sale."

discovery rule in 28 U.S.C. § 1658(b)(1) is limited by the "unqualified bar on actions" in § 1658(b)(2) that "giv[es] defendants total repose" after five years). Recently, in <u>Intel Corporation Investment Policy Committee v. Sulyma</u>, 140 S. Ct. 768 (2020), the Supreme Court interpreted the Employee Retirement Income Security Act's ("ERISA") requirement that a suit alleging a violation of ERISA or breach of fiduciary duty must be filed within the "earlier of" "six years after . . . the date of the last action which constituted a part of the breach or violation" or "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation."[5] 29 U.SC. § 1113. The Supreme Court explained that the six-year provision is a "statute of repose, which effect[s] a legislative judgment that a defendant should be free from liability after the legislatively determined period of time," whereas the three-year period "accelerates the filing deadline" and is a "statute of limitations, which 'encourage[s] plaintiffs to pursue diligent prosecution of known claims.'" <u>Intel Corp.</u>, 140 S. Ct. at 774. (quoting <u>California Pub. Employees' Ret. Sys.</u>, 582 U.S. at 504).

Accordingly, the two-year discovery provision in the MLA is properly viewed as a statute of limitations, whereas the five-year provision is considered a statute of repose. Once a plaintiff has "discover[ed] . . . the violation" at issue, a claim must be filed within two years; otherwise, in the absence of discovery, the plaintiff has five years to file a claim. This understanding of the structure of the MLA's statute of limitations informs the Court's analysis of the key issue in the parties' dispute—the interpretation of the discovery rule in § 987(f)(5)(E)(i).

---

[5] 29 U.S.C. § 1113 also provides that "in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation."

1.  The MLA's Discovery Rule

The parties disagree about whether "discovery by the plaintiff of the violation that is the basis for such liability," 10 U.S.C. § 987(f)(5)(E)(i), which triggers the two-year limitations period, requires that a plaintiff discover only the facts constituting the basis for the violation, as defendant argues, or instead requires that a plaintiff also know that the MLA was violated, as plaintiffs argue.  For the reasons explained below, the Court agrees with defendant's interpretation.

As an initial matter, the text of the discovery provision is not conclusive.  "Violation" is defined as an "infraction or breach of the law; a transgression," "[t]he act of breaking or dishonoring the law; the contravention of a right or duty," Black's Law Dictionary (8th ed. 2004), an "[i]nfringement, breach, or contravention of a rule," or "[i]nfringement of the law, a crime," Oxford English Dictionary (3d ed. 2014).  That a plaintiff must file suit within two years after discovering an "infraction or breach of the law" or "infringement of the law" does not resolve whether the plaintiff must know that the law was broken in order to have the requisite knowledge.  The inclusion of the phrase "that is the basis for such liability" after "violation" suggests that there is a distinction between the violation and the defendant's "liability"— meaning the "quality or state or of being legally obligated or accountable; legal responsibility to another or to society, enforceable by civil remedy or criminal punishment," Black's Law Dictionary, supra; see Oxford English Dictionary, supra (defining "liability" as "[t]he condition of being liable or answerable by law or equity").  "Discovery" applies only to the "violation" in § 987(f)(5)(E)(i), and not to "liability."  Because the statute does not require "discovery" of both the "violation" and "liability" but only the "violation that is the basis for such liability," the text appears to support the interpretation that only discovery of the violative conduct is required, and not discovery of the actionability of that conduct.  Nevertheless, the text is not conclusive, and it

is certainly possible to also read the text as suggesting that a discovery of the "violation" requires

knowledge that the law has been violated.  See Davidson v. United Auto Credit Corp., 65 F.4th

124, 129 (4th Cir. 2023) (observing that "as is most often the case, dictionaries cannot answer

our question" of statutory interpretation).

   In advancing their interpretations of the discovery rule, the parties point to similar

discovery provisions in other statutes of limitations, which are instructive for resolving the

dispute.  See Northcross v. Bd. of Ed. of Memphis City Sch., 412 U.S. 427, 428 (1973)

(observing that "[t]he similarity of language" in two statutes which "share a common raison

d'etre" is "a strong indication that the two statutes should be interpreted pari passu"); Stiltner v.

Beretta U.S.A. Corp., 74 F.3d 1473, 1484 (4th Cir. 1996) ("The '[i]ncorporation of identical or

similar language from an act with a related purpose evidences some intention to use it in a

similar vein.'" (quoting Doe v. DiGenova, 779 F.2d 74, 83 (D.C. Cir. 1985)) (emphasis in

original)).  As defendant points out, the Fair Credit Reporting Act ("FCRA") contains an

identical statute of limitations as the MLA.  See 15 U.S.C. § 1681p.[6]  The current version of the

FCRA's limitations period was enacted in 2003, when Congress amended the FCRA to expressly

provide for a discovery rule, see Fair and Accurate Credit Transactions Act of 2003, Pub L. No.

108-159, § 156, 117 Stat. 1952, 1968 (2003), which was well before 2013, when the MLA's

---

[6] 15 U.S.C. § 1681p provides that: "An action to enforce any liability created under this
subchapter may be brought in any appropriate United States district court, without regard to the
amount in controversy, or in any other court of competent jurisdiction, not later than the earlier
of—

   (1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for
   such liability; or

   (2) 5 years after the date on which the violation that is the basis for such liability occurs."

limitations period and discovery rule were enacted, see National Defense Authorization Act for Fiscal Year 2013, Pub L. No. 112-239, § 662, 126 Stat. 1632, 1785-86 (2013).

Although the Fourth Circuit has not addressed whether the FCRA's two-year discovery provision requires knowledge of the facts constituting the violation or knowledge that the FCRA itself has been violated, all the courts that have considered that question have found that knowledge of the law is not required to trigger the two-year period.  In Mack v. Equable Ascent Financial, LLC, 748 F.3d 663 (5th Cir. 2014) (per curiam), the Fifth Circuit, the only court of appeals to address the issue, rejected the plaintiff's argument that he could not have discovered the statutory violation at issue until he had researched the FCRA.  The Fifth Circuit reasoned that, consistent with the "general approach under the discovery rule," "a limitations period begins to run when a claimant discovers the facts that give rise to a claim and not when a claimant discovers that those facts constitute a legal violation." Id. at 666.

District courts, including one in this district, have followed the Fifth Circuit's interpretation of the FCRA's discovery rule.  See Milbourne v. JRK Residential Am., LLC, No. 3:12-cv-861 (REP), 2016 WL 1071569, at *6 (E.D. Va. Mar. 15, 2016) (applying the Fifth Circuit's interpretation in Mack); Datt v. Wells Fargo Bank, N.A., No. 5:19-cv-01216-EJD, 2019 WL 5722384, at *4 (N.D. Cal. Nov. 5, 2019) (same); Anderson v. Wells Fargo Bank, N.A., 266 F. Supp. 3d 1175, 1188 (D.S.D. 2017) (same); Wirt v. Bon-Ton Stores, Inc., 134 F. Supp. 3d 852, 858 (M.D. Pa. 2015) (observing that "the discovery of the actual facts, and not the knowledge that those facts give rise to a cause of action, is what causes the statute of limitations to run" and rejecting the plaintiff's argument that the two-year period began to run when "attorneys were able to ascertain the alleged violation"); Yurkovic v. New Jersey Higher Educ. Student Assistance Auth., No. 3:16-cv-5339-PGS-LHG, 2019 WL 7602361, at *3 (D.N.J. July

15, 2019); Steed v. Equifax Info. Servs., LLC, No. 1:14-cv-00437-SCJ-CMS, 2016 WL 7888040

(N.D. Ga. July 15, 2016), report and recommendation adopted, No. 1:14-cv-0437-SCJ, 2016 WL

7888039 (N.D. Ga. Aug. 31, 2016) (rejecting the plaintiff's argument that the statute of

limitations began to run when she consulted her attorneys and became more aware of the legal

issues). The Court has been unable to find any decision holding that the FCRA's two-year

period begins to run only when a plaintiff knows that the FCRA has been violated. As another

district court has explained, the theory that a cause of action accrues only upon knowledge that

the FCRA has been violated "presumes that a layperson will either have rather sophisticated

knowledge of [the] FCRA, or the ability to interpret the law, or have consulted with a lawyer

before the claim can accrue. No federal statute of limitations postpones accrual to that extent."

Lindor v. Trans Union LLC, No. 08 Civ. 5143 (BMC), 2009 WL 10700261, at *9 (E.D.N.Y.

Sept. 16, 2009), aff'd, 393 F. App'x 786 (2d Cir. 2010). Plaintiffs have not identified any legal

authority as a basis for the Court to deviate from the aforementioned persuasive authority on a

limitations period that is identical to 10 U.S.C. § 987(f)(5)(E)(i).[7]

Instead of relying on the FCRA, plaintiffs urge the Court to use authority from the

Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745 (2002), to find that § 987(f)(5)(E)(i)

requires not only discovery of relevant facts but also that the MLA has been violated, pointing to

the statute of limitations in § 804(a) of the Sarbanes-Oxley Act, codified at 28 U.S.C. § 1658(b),

which explicitly references discovery of "facts" as the triggering event. Specifically, 28 U.S.C.

§ 1658(b) provides that "a private right of action that involves a claim of fraud, deceit,

---

[7] Plaintiffs are certainly aware that the FCRA's statute of limitations is identical to that of the
MLA, because in their briefing on defendant's motion to dismiss the original Complaint, they
pointed to the FCRA's "identical statute of limitations," [Dkt. No. 27] at 9; however, they have
omitted any discussion of the FCRA in responding to defendant's Motion to Dismiss the
Amended Complaint.

manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. [§] 78c(a)(47)), may be brought not later than the earlier of—(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." Plaintiffs argue that Congress could have specified that the two-year limitations period in the MLA is triggered by the discovery of "facts constituting the violation," just as it did in § 1658(b), but did not do so, which suggests that the MLA's two-year period is triggered by knowledge that the MLA itself was violated.

The problem with plaintiffs' argument is that it requires inferring from the MLA's omission of "facts constituting the violation" that "discovery of the violation" requires knowledge of the law or the existence of an actionable claim, which is inconsistent with the traditional understanding of discovery rules. That inference is tenuous given that the plain language of § 1658(b)—that discovery requires knowing "the facts constituting the violation"— is exactly what is required under general discovery rules. The Supreme Court has observed that "discovery" is "often used as a term of art in connection with the 'discovery rule,' a doctrine that delays accrual of a cause of action until the plaintiff has 'discovered' it." Merck & Co., 559 U.S. at 644 (interpreting 28 U.S.C. § 1658(b)). When "legislators have written the word 'discovery' directly into the statute," "state and federal courts have typically interpreted the word to refer not only to actual discovery, but also to the hypothetical discovery of facts a reasonably diligent plaintiff would know," id. at 645, and "treatise writers now describe 'the discovery rule' as allowing a claim 'to accrue when the litigant first knows or with due diligence should know facts that will form the basis for an action," id. at 646 (quoting Calvin Corman, Limitation of Actions, § 11.1.1, at 134 (1991)); see Hamilton v. 1st Source Bank, 895 F.2d 159, 163 (4th Cir.), aff'd in

part, rev'd in part on other grounds, 928 F.2d 86 (4th Cir. 1990) (providing a similar

interpretation of the "discovery rule" generally applied by federal courts).

In general, a cause of action subject to a discovery rule accrues "as soon as a potential

claimant either is aware or should be aware of the existence of and source of his injury, not when

he knows or should know that the injury constitutes a legal wrong," as "a different rule would

require insufficient diligence on the part of potential claimants." Lee v. United States, 809 F.2d

1406, 1410 (9th Cir. 1987); see Keystone Ins. Co. v. Houghton, 863 F.2d 1125, 1127 (3d Cir.

1988) (observing that awareness that "each element" of a claim "is present is crucial" while

"cognizance of the legal implication of these facts . . . is irrelevant" (emphasis in original));

Kovacs v. United States, 614 F.3d 666, 674 (7th Cir. 2010) ("It does not matter whether the

plaintiff knows the injury is actionable—he need only know that he has been injured."). In

United States v. Kubrick, 444 U.S. 111 (1979), the Supreme Court found that lower courts

improperly expanded the discovery rule applying to medical malpractice cases brought under the

Federal Tort Claims Act when they required that a plaintiff know the "legal implications" of the

facts, meaning that they had to suspect negligence, reasoning that "[w]e are unconvinced that for

statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the

fact of his injury or its cause should receive identical treatment." Id. at 122. In explaining that

accrual of a claim does not "await awareness by the plaintiff that his injury was negligently

inflicted," the Supreme Court observed that a plaintiff, "armed with the facts about the harm

done to him, can protect himself by seeking advice in the medical and legal community." Id. at

123; see Childers Oil Co. v. Exxon Corp., 960 F.2d 1265, 1272 (4th Cir. 1992) (observing that

"[t]he 'discovery rule' tolls a statute of limitations until the plaintiff has, or ought to have,

answers to two questions: Am I injured? Who injured me? . . . At that point, the plaintiff has

enough information to begin investigating his claims. . . . He may not know enough to win a verdict or even file a complaint on that first day, but that is why the law gives him a reasonable limitations period to investigate"); see also Corman, supra, § 11.1.5, at 161 ("When the right of action is created by statute and the discovery rule is applied, commencement of the applicable statute of limitations is not postponed until the plaintiff obtains knowledge that the statute has been violated but instead accrues when the plaintiff becomes aware of the cause of the injury.").

In addition to the FCRA and 28 U.S.C. § 1658(b), the Court has reviewed other federal statutory discovery rules, and other than a lone Third Circuit decision discussed below, courts have consistently found that "discovery" requires that a plaintiff have knowledge only of the facts constituting the violation and not the legal implications of those facts.  For example, the Sixth, Seven, Ninth, and Eleventh Circuits have interpreted ERISA's discovery provision that an action must be brought within three years after the plaintiff had "actual knowledge of the breach or violation," 29 U.S.C. § 1113(2), and held that it requires only "knowledge of the facts or transaction that constituted the alleged violation; it is not necessary that the plaintiff also have actual knowledge that the facts establish a cognizable legal claim under ERISA in order to trigger the running of the statute."  Wright v. Heyne, 349 F.3d 321, 330 (6th Cir. 2003); see Martin v. Consultants & Administrators, Inc., 966 F.2d 1078, 1086 (7th Cir. 1992) (explaining that "the relevant knowledge for triggering the statute of limitations is knowledge of the facts or transaction that constituted the alleged violation," and "it is not necessary for a potential plaintiff to have . . . knowledge of [a transaction's] illegality" (emphasis in original)); Blanton v. Anzalone, 760 F.2d 989, 992 (9th Cir. 1985) (rejecting the argument that the limitations period does not begin to run until an attorney advises the plaintiff that the transaction is prohibited because "[t]he statute of limitations is triggered by . . . knowledge of the transaction that

26

constituted the alleged violation, not by . . . knowledge of the law"); Brock v. Nellis, 809 F.2d 753, 755 (11th Cir. 1987) (holding that the statute of limitations is triggered upon the "learn[ing] of the facts that support [an] allegation of illegality").

In contrast, the Third Circuit has held that "actual knowledge of a breach or violation" requires that the plaintiff "actually knew not only of the events that occurred which constitute the breach or violation but also that those events supported a claim of breach of fiduciary duty or violation under ERISA." Int'l Union of Elec., Elec., Salaried, Mach. & Furniture Workers, AFL-CIO v. Murata Erie N. Am., Inc., 980 F.2d 889, 900 (3d Cir. 1992); see Maher v. Strachan Shipping Co., 68 F.3d 951 (5th Cir. 1995) (applying the Third Circuit's standard).

The Fourth Circuit has considered these competing interpretations of ERISA's discovery provision but declined to decide whether knowledge of the existence of a legal claim is required, instead ruling that "there cannot be actual knowledge of a violation for purposes of the limitation period unless a plaintiff knows 'the essential facts of the transaction or conduct constituting the violation.'" Browning v. Tiger's Eye Benefits Consulting, 313 F. App'x 656, 661 (4th Cir. 2009) (quoting Edes v. Verizon Commc'ns, Inc., 417 F.3d 133, 142 (1st Cir. 2005)); see also Caputo v. Pfizer, Inc., 267 F.3d 181, 193 (2d Cir. 2001) (holding that an ERISA plaintiff has "actual knowledge of the breach or violation" when he has "knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act," although "a plaintiff need not have knowledge of the relevant law"). In any case, the Third Circuit's interpretation of ERISA's discovery rule is distinguishable from the MLA's discovery provision because the Third Circuit relied in large part on the "stringent requirement" of the "actual knowledge" standard in ERISA. Int'l Union, 980 F.2d at 901. By

contrast, the MLA contains no such actual knowledge standard and requires only "discovery by the plaintiff of the violation." 10 U.S.C. § 987(f)(5)(E)(i).

The Right to Financial Privacy Act provides that an action to enforce the statute's provisions must be brought "within three years from the date on which the violation occurs or the date of discovery of such violation, whichever is later." 12 U.S.C. § 3416.  District courts that have interpreted § 3416's discovery provision have held that the "date of discovery is not the date when plaintiff realizes he has a legal cause of action; rather, it is the date on which plaintiff becomes aware of the alleged injury." Giannone v. Bank of America, 812 F. Supp. 2d 216, 220-21 (E.D.N.Y. 2011) (citing Kubrick, 444 U.S. at 122); see McCune v. U.S. Dep't of Just., 997 F. Supp. 2d 487, 497 (S.D. Miss.), aff'd, 592 F. App'x 287 (5th Cir. 2014) (same).

Therefore, the mere difference in language between "discovery . . . of the violation" in the MLA as opposed to "discovery of the facts constituting the violation" in 28 U.S.C. § 1658(b), an unrelated statute pertaining to securities fraud, does not persuade the Court to deviate from the traditional interpretation of discovery rules.  Rather, interpreting "discovery . . . of the violation" in the MLA as requiring only discovery of the facts constituting the violation and not the existence of a cognizable legal claim is consistent with jurisprudence on identical or similar statutory discovery rules.  Moreover, that interpretation of the statute of limitations "furthers the policies underlying statutes of limitations," among them "preventing plaintiffs from sleeping on their rights and prohibiting the prosecution of stale claims." Wright, 349 F.3d at 330.  As the Sixth Circuit explained in the context of ERISA's limitations period, "If the statute were tolled until an attorney informs the plaintiff that he or she has an ERISA claim, a plaintiff could delay accrual of a claim simply by waiting before consulting an attorney.  This would nullify the three-year limitation period of Section 1113(2), something Congress surely did not intend to result

28

when it enacted the statute." Id.; see Kubrick, 444 U.S. at 123 (observing that excusing a plaintiff from investigating and seeking advice on the "facts about the harm done to him" by "postponing the accrual of his claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation" of claims). That reasoning applies equally to the MLA because under plaintiffs' proffered interpretation of the statute of limitations, a plaintiff could delay accrual of a claim by simply waiting to consult an attorney and thereby avoid triggering the two-year limitations period.

Plaintiffs also argue that an interpretation that the two-year period begins to run upon discovery of the facts constituting the violation would nullify the five-year period of § 987(f)(5)(E), because a covered member is "always going to be aware she is obtaining a loan" and therefore know of the unlawful lending practices and be subject to the two-year discovery provision. [Dkt. No. 58-1] at 5. At oral argument, plaintiffs' counsel asserted that such an interpretation would effectively limit all MLA claims to the two-year statute of limitations and that she could not envision a circumstance where the statute of limitations would not be triggered the moment a covered member obtains a loan. This argument is unpersuasive. There is at least one MLA violation that in many cases would not be discovered by a covered member when she obtains a loan: an inaccurate MAPR. Plaintiffs' counsel is no doubt aware of this kind of claim because it was asserted as Count I, which plaintiffs voluntarily dismissed, and defendant did not raise a statute of limitations defense as to that claim for loans that were within the five-year limitations period. Moreover, the MLA's discovery rule would protect a plaintiff in cases of fraud, where deceptive conduct may prevent a plaintiff from knowing that she has been injured, and in such cases the limitations period would not begin to run until discovery of the fraud. See Merck & Co., 559 U.S. at 644-45 (discussing fraud-based discovery rules). Moreover, as

29

discussed above, the five-year period does not serve as an alternate statute of limitations but functions as a statute of repose to give defendants finality.

Finally, plaintiffs argue that based on the remedial purposes of the MLA, the statute of limitations should be interpreted in a way that protects service members. See [Dkt. No. 58-1] at 5. The Court is sympathetic to plaintiffs' argument that a consumer financial protection statute designed to protect a vulnerable and special population—active duty members of the armed forces—from predatory lending and which gives them a right to enforce those protections should be liberally construed to safeguard service members' rights. Plaintiffs may be right that service members will usually be aware of the lending practices to which they are being subjected, such as refinancing, mandatory allotment, and security interests, but they may not know that the practices violate federal law. The finding that a plaintiff only has two years to file a civil action after learning of the facts constituting a violation of the MLA would undercut some of the protections and rights afforded by the MLA; however, the purpose of the statute of limitations is to encourage plaintiffs to promptly and diligently investigate their injuries, and the Court can find no legal basis to justify a different interpretation of the MLA's discovery rule than what has been found by other courts in applying identical or similar language in other consumer protection statutes.

Further, it is significant that the MLA on its face provides for a more plaintiff-friendly statute of limitations than other similar consumer protection statutes which do not have discovery rules. For example, the Truth in Lending Act, 15 U.S.C. § 1640(e), Electronic Fund Transfer Act, 15 U.S.C. § 1693m(g), and Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692k(d), contain only a one-year statute of limitations that begins to run from the date of the occurrence of the violation. Under those statutes, it does not matter that a plaintiff knows that

the violation has occurred, let alone that she has a cognizable legal claim.  See Rotkiske v. Klemm, 140 S. Ct. 355, 360 (2019) (declining to apply a "general discovery rule as a principle of statutory interpretation" to the FDCPA, which provides that an action must be brought "within one year from the date on which the violation occurs," 15 U.S.C. § 1692k(d), and holding that the "limitations period begins to run on the date the alleged FDCPA violation actually happened").  In comparison to other federal laws that aim to protect consumers from predatory lending practices, the MLA encompasses a greater remedial effect because it expressly includes a discovery rule.  Congress could certainly provide for additional protections, namely requiring knowledge that the MLA was violated for a plaintiff's claim to accrue, but the statute does not say that and the Court will not infer such a requirement from the MLA's statute of limitations as it exists today.

In sum, the two-year limitations period is triggered when a plaintiff discovers the facts constituting the basis for the MLA violation and not when the plaintiff recognizes that these facts support a legal claim.

   2.  Application to Plaintiffs' Loans

Under this interpretation of the MLA's statute of limitations, the majority of loans underlying plaintiffs' claims are time-barred.  Although a defense based on the statute of limitations ordinarily cannot be resolved on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) because it is raised by a defendant through an affirmative defense, "where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  Goodman v. Praxair, Inc., 494 F.3d 458, 465 (4th Cir. 2007).  "[A]ll facts necessary to the affirmative defense [must] 'clearly appear[] on the face of the complaint,'" and a defendant must show "that the plaintiff's potential rejoinder to the affirmative defense was foreclosed by the allegations in the complaint."  Id. at

465-66 (emphasis in original) (quoting <u>Richmond, Fredericksburg & Potomac R.R. v. Forst</u>, 4 F.3d 244, 250 (4th Cir. 1993)).

      a.  <u>Wood's Loans</u>

     The Amended Complaint alleges that Wood obtained eight unlawful loans from Omni dated November 16, 2016, January 5, 2017, August 15, 2017, May 18, 2018, November 14, 2018, October 23, 2019, September 8, 2021, and April 8, 2022.  Because Wood first filed her Complaint on October 12, 2022, claims based on her November 16, 2016 and January 5, 2017 loans are completely time-barred by the MLA's five-year statute of repose.  Defendant argues that Wood's claims based on the four loans obtained between August 15, 2017 to October 23, 2019 are barred by the two-year statute of limitations because Wood knew of the alleged MLA violations when she entered into the loans.  Counts II, III, and IV will be addressed in turn with respect to these loans.

     The statute of limitations for Count II, the Roll Over Claim, began to run when Wood discovered that Omni had "roll[ed] over, renew[ed], repa[id], refinance[d], or consolidate[d] any consumer credit" extended to her by Omni with the proceeds of other credit that Omni had extended to her.  10 U.S.C. § 987(e)(1).  Defendant argues that Count II is time-barred as to the loans that Wood obtained on August 15, 2017 and May 18, 2018 because she knew the loans involved refinances and therefore discovered the facts constituting a violation of § 987(e)(1) when she obtained the loans.  The Amended Complaint alleges that Wood did not know that these loans involved refinances of existing obligations because:

> none of Omni's standard forms, Repayments [sic] Agreements, or Truth in Lending Disclosures signed by SSG Wood identify in any manner that the new loans were actually refinanced loans and do not contain any terminology that explains that fact. Furthermore, the loans did not appear to be a roll-over, refinance, renewal, repayment, or consolidation.  The loans were offered as a new loan that provided new funds and all of the loans are done electronically on computers provided by Omni.  SSG Wood did not understand the true nature of these loans or that they included illegal

rollovers/refinancing until she was advised by her counsel in 2022.   The only indication that the previous loans were being refinanced required the borrower to understand that the designation of 'amount paid on my account' and its meaning within the context of the new loan.

[Dkt. No. 39] ¶ 41.

Defendant correctly points out that these allegations are not plausible in light of the nature of the loan and the loan documents, which clearly indicated that the loans were refinances or used to repay existing obligations.[8]  For example, the loan dated May 18, 2018 for $1,768.13 disclosed the "Itemization Of Amount Financed," stating that $536.57 was the "Amount Given To ME Directly," while $1,231.56 was the "Amount Paid On MY Account with YOU."  [Dkt. No. 45-1] at 5.

May 18, 2018 Loan Disclosure Excerpt

FEDERAL TRUTH IN LENDING DISCLOSURES:

| ANNUAL PERCENTAGE RATE The cost of MY credit as a yearly rate. | 32.322% |
| FINANCE CHARGE The dollar amount the credit will cost ME. | $321.87 |
| Amount Financed The amount of credit provided to ME or on MY behalf. | $1768.13 |
| Total of Payments The amount I will have paid after I have made all payments as scheduled. | $2090.00 |

My Payment Schedule: 11 monthly payments of $190.00 are due on the last day of each month beginning on 5-30-2018.
Late Charge: If MY full monthly payment does not reach U within 10 days following its due date I will be charged a late charge equal to $15.00.
Prepayment: If I pay off all or any part of MY loan early, I will not have to pay a penalty.
Security: I am giving YOU a security interest in
[ ] automobile.   [ ] property.   does not ___ U
[X] the bank account identified in MY Repayment Agreement.
I will see MY contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date and prepayment refunds and penalties.

by Omni Financial of Nevada, Inc.
on 05/18/2018

| Itemization Of Amount Financed | |
| Amount Given To ME Directly | $536.57 |
| Amount Paid On MY Account With YOU | $1231.56 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| AMOUNT FINANCED: | $1768.13 |
| Prepaid Finance Charge [1] | $42.93 |
| Principal Amount Of Loan | $1811.06 |

1 - Included in the finance charge is a prepaid finance charge that is non-refundable after 15 days (see 15 day guarantee) even if the loan is prepaid in full.

Estimated Disclosures Date: 2018-05-18
Contract Date: 2018-05-18
Final Disclosures Date: 2018-05-18
Interest Start Date: 2018-05-18
Maturity Date: 2019-04-30

---

[8] Although Wood attached copies of the loan documents to the original Complaint, she omitted them from the Amended Complaint; however, Omni included them as attachments to its Motion to Dismiss, and because these documents are integral to the complaint and plaintiffs have not challenged their authenticity, they may be considered on a motion to dismiss.  See Sec'y of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007).

Id. Even though the loan disclosure did not use the specific words "refinancing or rollover," Wood's assertion that she did not know this new loan was used to repay or refinance a previous loan is not plausible because, as the Amended Complaint alleges, these loans "included amounts that were used to pay off prior loans," [Dkt. No. 39] ¶ 41, and when Wood obtained a loan on May 18, 2018 for $1,768.13, the loan disclosure indicated that she was only given $536.57 and accordingly must have known that part of the loan—$1,231.56—was being used to pay off a prior obligation on her account with Omni. Wood's immediately preceding loan dated August 15, 2017 was also marked as "PAID" on May 18, 2018. [Dkt. No. 45-1] at 4. The August 15, 2017 loan contains an identical disclosure about the "Amount Paid on MY Account with YOU," id., and the immediately preceding loan was also marked as "PAID" on August 15, 2017, id. at 3.

Moreover, discovery of the facts constituting a violation refers not only to a plaintiff's "actual discovery" of the facts constituting the violation, but also to "facts that a reasonably diligent plaintiff would have discovered." Merck & Co., 559 U.S. at 644-46 (observing that in interpreting "discovery rules" codified by legislatures, "state and federal courts have typically interpreted the word to refer not only to actual discovery, but also to the hypothetical discovery of facts a reasonably diligent plaintiff would know"). Even if Wood did not actually know that her loans obtained on August 15, 2017 and May 18, 2018 involved a refinance or were used to repay other credit, a reasonably diligent plaintiff would have known that simply by reading the loan documents. A party is presumed to read and understand the contents of a contract before signing it, absent "fraud, duress, or mutual mistake." Johnson v. Opportunity Fin., LLC, No. 3:2-cv-190, 2023 WL 2636712, at *10 (E.D. Va. Mar. 24, 2023) (quoting Metro Realty of Tidewater, Inc. v. Woolard, 286 S.E.2d 197, 200 (Va. 1982)); see Sydnor v. Conseco Fin. Servicing Corp., 252 F.3d 302 (4th Cir. 2001) ("[A] party signing a written contract has a duty

34

'to inform himself of its contents before executing it, . . . and in the absence of fraud or overreaching he will not be allowed to impeach the effect of the instrument by showing that he was ignorant of its contents or failed to read it."). At oral argument on the first motion to dismiss, plaintiffs' counsel agreed with the Court that facts appearing "on the face of the document" would put a plaintiff "on notice" of the contents of the document. [Dkt. No. 38] at 13-14. For these reasons, Wood knew or reasonably should have known that the loans dated August 15, 2017 and May 18, 2018 involved refinances of existing obligations when she obtained them, and because discovery of the facts constituting a violation of § 987(e)(1) for those two loans occurred more than two years before she filed this lawsuit, Count II is time-barred with respect to those loans. Accordingly, only her loan dated April 8, 2022 is within the two-year limitations period for Count II.

As for Count III, which alleges a violation of the MLA's prohibition on requiring repayment through military allotment, 10 U.S.C. § 987(e)(6), that claim accrued when Wood discovered that Omni mandated repayment by allotment as a condition for extending her credit. The Amended Complaint alleges that before December 30, 2020, Wood "appeared in-person at Omni's brick and mortar stores," and was told by Omni employees "that she must sit at Omni's computer and login to My[P]ay/DFAS," the Department of Defense's pay system for service members, and "complete an allotment prior to receiving the proceeds of her installment loan as repayment by allotment is a condition to her loans." [Dkt. No. 39] ¶ 168. In response to "Omni's demand," Wood logged onto her MyPay/DFAS account and signed up for an allotment to repay her Omni loan. Id. ¶ 169. The Amended Complaint further alleges that Omni pre-checked the option to repay the loan by allotment on all four Repayment Agreements. Id. ¶ 45.

Defendant correctly points out that, from the face of the Amended Complaint, Wood knew that Omni was requiring that she sign up for allotment as a condition of obtaining her loan at the time each loan was originated, because the Amended Complaint alleges that Omni's employees made that demand of Wood every time she appeared in person to apply for a loan. Therefore, Wood knew of the facts constituting a violation of § 987(e)(6) when she obtained her loans on August 15, 2017, May 18, 2018, November 14, 2018, and October 23, 2019, and because more than two years have passed as to all four of these loans, Count III is time-barred with respect to those loans. Only her loans dated September 8, 2021, and April 8, 2022 are within the two-year limitations period for Count III.

The statute of limitations for Count IV, which alleges a violation of 10 U.S.C. § 987(e)(5), began to run when Wood discovered that Omni was using a method of access to her bank account as security for the obligation. The Amended Complaint alleges that for all of Wood's loans, Omni required her to grant it a security interest in her bank account where her military pay was deposited as verified by her Leave and Earnings Statement. [Dkt. No. 39] ¶ 206. The Amended Complaint alleges that when Wood went to Omni to apply for a loan, Omni employees required her to produce her end of month Leave and Earnings Statement, which revealed where her military pay was deposited, and to agree not to dispute any amount that Omni debited from that bank account, thereby obtaining a security interest in her bank account. Id. ¶¶ 170-74, 205-08. The Amended Complaint alleges that the Repayment Agreements reflect the security interest by stating that Wood "certifies that [she] is an owner of or authorized signed [sic] for the Deposit Account" and "will not dispute payments debited from the Deposit Account." Id. ¶ 207. Based on these allegations, Wood knew that Omni was obtaining access to

her bank account as security for the obligation when she signed up for the loans and executed the Repayment Agreements.  See [Dkt. Nos. 45-5] at 6-13.

In addition, the loan documents provided to Wood clearly indicated that she was granting Omni a security interest in her bank account.  For example, the August 15, 2017 loan document included the following disclosure:

August 15, 2017 Loan Disclosure Excerpt



[Dkt. No. 45-1] at 4.  These allegations show that Wood knew of the facts constituting a violation of § 987(e)(5) when she obtained loans from Omni on August 15, 2017, May 18, 2018, November 14, 2018, and October 23, 2019, and therefore Count IV is time-barred with respect to those loans pursuant to the MLA's two-year statute of limitations.  Like Count III, only Wood's loans dated September 8, 2021 and April 8, 2022 are within the limitations period for Count IV.

b.   Godfrey's Loans

The Amended Complaint alleges that "[u]pon information and belief, over the last five years," Godfrey obtained "at least six (6) installment loans" from Omni, "at least one of which violates the MLA."  [Dkt. No. 39] ¶ 57.  Godfrey has alleged facts about only one loan, "her final loan that she repaid on January 4, 2019."  Id. ¶ 57 n.18.  Godfrey attached to the Amended Complaint loan documents for that loan showing that it was obtained on December 22, 2016. See [Dkt. No. 39-2] at 4.  Defendant correctly argues that all of Godfrey's claims as to that loan are time-barred because violations of the MLA based on the unlawful refinance, mandatory allotment, and security interest occurred at the time the loan was obtained on December 22,

2016, which was more than five years before Godfrey joined this lawsuit as a plaintiff on February 3, 2023. Plaintiffs do not dispute that Godfrey's final loan was obtained on December 22, 2016. As such, claims based on any prior loans purchased from Omni would also be time-barred by the MLA's five-year statute of repose.[9]

### 3. Equitable Tolling Based on Fraudulent Concealment

In a final effort to avoid partial dismissal of their claims on timeliness grounds, plaintiffs argue that the two-year statute of limitations should be equitably tolled due to fraudulent concealment because Omni's conduct prevented plaintiffs from learning the "information and facts necessary to discover the MLA violations." [Dkt. No. 58-1] at 8. "[T]o toll a limitations period based on fraudulent concealment, 'a plaintiff must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence.'" Edmonson v. Eagle Nat'l Bank, 922 F.3d 535, 548 (4th Cir. 2019) (quoting Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc., 71 F.3d 119, 122 (4th Cir. 1995)).

In order to satisfy the first element, plaintiffs must "provide evidence of affirmative acts of concealment" of the alleged violation by the defendant. Id. at 553 (quoting Marlinton, 71 F.3d at 126). "A plaintiff satisfies its burden to allege an affirmative act of concealment if, for example, it alleges that the defendant employed 'some trick or contrivance intended to exclude suspicion and prevent inquiry.'" Id. (quoting Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430,

---

[9] Moreover, the Amended Complaint's allegations that loans Godfrey obtained from Omni before December 22, 2016 violated the MLA are, at this stage, conclusory. As the Amended Complaint admits, other than the December 22, 2016 loan for which specific violations of the MLA were alleged, "Godfrey will review any other eligible loans for violations of the MLA" after the documents are produced by defendant. [Dkt. No. 39] ¶ 57 n.19.

446-47 (6th Cir. 2012)).  In addition, pursuant to Fed. R. Civ. P. 9(b), allegations of fraudulent

concealment must be stated with particularity.  Id.

To support the allegation that "Omni disguised and buried information and facts

necessary to discover the MLA violations," plaintiffs argue that Omni "[m]isrepresents that

allotment is the most-convenient method of loan repayment and that the benefits exceed

alternatives" and "[i]ntentionally disguises and disclaims . . . the refinance/rollover nature of

these loans" because "[n]owhere does the paperwork state that it is a refinance of an earlier

loan." [Dkt. No. 58-1] at 8 (citing paragraphs 28, 41, and 42 of the Amended Complaint).

Plaintiffs also assert that Omni prevented them from discovering the "violative nature of the

loans" because the loan transactions were done on computers in Omni's office with documents

"pushed quickly past the [p]laintiffs." Id. at 9.

The Amended Complaint does not allege sufficient facts to entitle plaintiffs to the benefit

of equitable tolling based on fraudulent concealment.[10]  Omni's purported misrepresentation that

allotments are "the most-convenient method of loan repayment," [Dkt. No. 58-1] at 8, does not

constitute an "affirmative act of concealment," Edmonson, 922 F.3d at 553, because plaintiffs

have not explained how or why that statement was fraudulent; as plaintiffs are well aware, the

MLA does not absolutely prohibit repayment by allotment but only prohibits requiring

repayment by allotment as a condition of obtaining a loan.  Moreover, what matters for

---

[10] Plaintiffs argue that "[a]t the hearing on Omni's first Motion to Dismiss, the Court confirmed that a concept like equitable tolling could potentially apply to [p]laintiffs' claims," pointing to the Court's statement that "it might be possible for showing a pattern of conduct, et cetera, from an evidentiary standpoint, you may be able to use evidence of loans that are outside the statute of limitations." [Dkt. No. 58-1] at 7 (quoting [Dkt. No. 38] at 10).  As defendant points out, plaintiffs entirely misstate the record.  In making this observation, the Court was not discussing tolling of the statute of limitations; rather, the Court was responding to a question from plaintiffs' counsel about whether they could "go back and look at Omni's conduct" with regards to loans outside the statute of limitations.  See [Dkt. No. 38] at 10.

fraudulent concealment as a basis for tolling a statute of limitations is that the defendant "wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action." Id. at 549. The allegations in the Amended Complaint do not show that Omni's characterization of the convenience of repayment by allotment amounted to a misrepresentation or concealment of facts giving rise to plaintiffs' MLA claim. For example, there are no allegations suggesting that Omni misled plaintiffs into believing it was permissible to require them to repay by allotment as a condition for obtaining a loan. See Caballero v. Am. Mortg. Network, No. 1:11-cv-622 JCC/JFA, 2011 WL 3440025, at *4 (E.D. Va. Aug. 8, 2011). According to the Amended Complaint, plaintiffs knew when they obtained their loans that Omni was requiring repayment by allotment because Omni employees told them that. What they did not know is that the MLA prohibits that practice, but plaintiffs' "ignorance of the law" "stems from no act of concealment by defendant, whose agents had no duty to explain the law to [them], and thus cannot be said to have concealed the law from [them]." Barnes v. West, Inc., 243 F. Supp. 2d 559, 564 (E.D. Va. 2003).

Likewise, plaintiffs' assertion that Omni "[i]ntentionally disguises and disclaims . . . the refinance/rollover nature of these loans" is unavailing. [Dkt. No. 58-1] at 8. As discussed, this assertion is implausible and undermined by the nature of the loans as well as the loan documents, which make clear that proceeds from new loans were used to pay off outstanding account balances. Plaintiffs focus on their claim that "[n]owhere does the paperwork state that it is a refinance of an earlier loan," id., but the violation is not tied to the use of specific terminology. Rather, it is the substance of the transaction that is key, as the MLA prohibits a creditor from using the proceeds of credit to "repay[]" other credit extended to the borrower, 10 U.S.C. § 987(e)(1), and that fact is apparent from the face of the loan transaction and disclosures.

Failure to use certain terminology does not amount to fraudulent concealment when substantively there was no misrepresentation, even if plaintiffs may not have understood the legal consequences of their loans.  The Amended Complaint does not allege any "trick[s] or contrivance[s]," Edmonson, 922 F.3d at 553, that Omni employed to affirmatively conceal that the loans involved refinances or repayments of existing obligations.

Finally, plaintiffs' assertion that Omni concealed the violations from them "in what was essentially a sales office with a package of documents pushed quickly past" them,[11] [Dkt. No. 58-1] at 9, does not justify tolling based on fraudulent concealment.  Even if the loan documents were presented to plaintiffs on computers in Omni's sales office in quick fashion, there was no concealment of the alleged violations: plaintiffs were still aware that Omni employees told them that repayment by allotment was required, and they ultimately retained possession of the loan documents which showed that the loans involved refinances of existing obligations (which they attached to their pleadings).  Simply put, plaintiffs have not alleged sufficient facts to show that defendant did anything to prevent them from learning of the facts supporting their claims or from timely filing their claims, and therefore there is no basis to toll the statute of limitations based on fraudulent concealment.

In sum, the Amended Complaint is time-barred with respect to all of Godfrey's loans and Wood's loans except those obtained on September 8, 2021 and April 8, 2022.

### D. **Roll Over Claim (Count II)**

As to Wood's claim that the April 8, 2022 loan violated 10 U.S.C. § 987(e)(1), the MLA's prohibition against roll over or refinance loans, defendant argues that Count II fails to

---

[11] This assertion was not pleaded in the Amended Complaint, and it is well established that a plaintiff cannot amend a pleading through a response to a motion to dismiss.

state a plausible claim for relief because it does not allege that Omni is a "creditor" under the applicable definition for § 987(e)(1).

Omni correctly points out that a narrower definition of "creditor" applies to the MLA's refinancing and roll-over prohibition under the implementing regulations promulgated by the Department of Defense.  The MLA generally defines a "creditor" as a person who is "(i) engaged in the business of extending consumer credit; and (ii) meets such additional criteria as are specified for such purpose in regulations prescribed under this section," id. § 987(i)(5)(A), and the MLA directs the Secretary of Defense to prescribe regulations establishing "[d]efinitions of 'creditor'" under the MLA, id. § 987(h)(2)(D).  The Department of Defense's implementing regulations, 32 C.F.R. § 232.2(i), accordingly define a "creditor" as:

> Creditor, except as provided in § 232.8(a), (f), and (g), means a person who is:
>
> (1) Engaged in the business of extending consumer credit; or
>
> (2) An assignee of a person described in paragraph (i)(1) of this section with respect to any consumer credit extended.
>
> (3) For the purposes of this definition, a creditor is engaged in the business of extending consumer credit if the creditor considered by itself and together with its affiliates meets the transaction standard for a "creditor" under Regulation Z with respect to extensions of consumer credit to covered borrowers.

Id.  One of the enumerated exceptions, § 232.8(a), defines "creditor" for the purposes of the MLA's prohibition on refinance and roll over loans, which is the basis for Count II of the Amended Complaint.  Because the regulations include a specific definition of "creditor" in the context of refinance and roll over loans, and this definition is an exception to the general definition, the specific definition provided by § 232.8(a) applies to plaintiffs' claims in Count II. Under that definition

[t]itle 10 U.S.C. 987 makes it unlawful for any creditor to extend consumer credit to a covered borrower with respect to which: . . . (a) The creditor rolls over, renews, repays, refinances, or consolidates any consumer credit extended to the covered borrower by the same creditor with the proceeds of other consumer credit extended by that creditor to the same covered borrower. . . . <u>For the purposes of this paragraph, the term "creditor" means a person engaged in the business of extending consumer credit subject to applicable law to engage in deferred presentment transactions or similar payday loan transactions (as described in the relevant law)</u>, provided however, that the term does not include a person that is chartered or licensed under Federal or State law as a bank, savings association, or credit union.

<u>Id.</u> § 232.8(a) (emphasis added).  The MLA and its regulations therefore make clear that the prohibition on rollover loans applies only to a creditor "engaged in the business of extending consumer credit subject to applicable law to engage in deferred presentment transactions or similar payday loan transaction (as described in the relevant law) . . . ." <u>Id.</u>

In arguing that the MLA prohibits Omni from refinancing or rolling over loans, plaintiffs conveniently omit the more limited definition of "creditor" in § 232.8(a) from their papers and maintain that because Omni is "engaged in the business of extending consumer credit," it is a creditor under the MLA and is therefore subject to the roll over prohibition.  [Dkt. No. 58-1] at 12.  Plaintiffs dismiss the regulation as a "statutory guidance . . . regarding payday lenders" which "does not trump the literal definition of creditor which clearly covers Omni," and argue that "Omni is a creditor as defined by the statute." <u>Id.</u> at 13.  Plaintiffs misread the regulations, which make clear that 32 C.F.R. § 232.8(a) provides the definition of "creditor" applicable to the MLA's roll over prohibition.

Plaintiffs cite no authority for the proposition that the Court may disregard the relevant definition of creditor in the Department of Defense's implementing regulations, which carry the force of law. <u>See</u> <u>Chrysler Corp. v. Brown</u>, 441 U.S. 281, 295-96 (1979).  Congress has authorized the Department of Defense to "prescribe regulations" for the "[d]efinitions of 'creditor,'" 10 U.S.C. §§ 987(h)(1), (h)(2)(D), and the MLA also provides that a creditor "means

a person who . . . meets such additional criteria as are specified for such purpose in regulations prescribed under this section," id. § 987(i)(5)(A)(ii).  It is well established that "[w]hen Congress has 'explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation,' . . . and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute."  United States v. Mead Corp., 533 U.S. 218, 227 (2001) (quoting Chevron v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984)); see Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 165 (2007); Schrum v. Comm'r of the Internal Revenue Serv., 33 F.3d 426, 430 (4th Cir. 1994) (providing that a regulation promulgated pursuant to the "'express Congressional delegation of power' . . . is 'legislative in character and as binding upon a court as a statute'" (quoting A.C. Monk & Co. v. United States, 686 F.2d 1058, 1060 n.2 (4th Cir. 1982))).  Plaintiffs do not challenge 32 C.F.R. § 232.8(a) on substantive or procedural grounds, and accordingly that definition is binding on the Court and will be applied.

        The Amended Complaint does not allege that Omni is a creditor within the meaning of 32 C.F.R. § 232.8(a), which requires that a creditor be "engaged in the business of extending consumer credit subject to applicable law to engage in deferred presentment transactions or similar payday loan transactions (as described in the relevant law)."  The MLA's regulations do not define "deferred presentment transactions or similar payday loan transactions," but the regulations provide that "[w]ords that are not defined in this part have the same meanings given to them in Regulation Z (12 CFR part 1026) issued by the [Consumer Financial Protection] Bureau, as amended from time to time, including any interpretation thereof by the Bureau or an official or employee of the Bureau duly authorized by the Bureau to issue such interpretations."

44

Id. § 232.3(s).  Words that are not defined in Regulation Z or its interpretations "have the

meanings given to them by State or Federal law."  Id.  The CFPB's official interpretation of

"credit" in Regulation Z explains that "payday loan" or "deferred-presentment loan" refers to

transactions "in which a cash advance is made to a consumer in exchange for the consumer's

personal check, or in exchange for the consumer's authorization to debit the consumer's deposit

account, and where the parties agree either that the check will not be cashed or deposited, or that

the consumer's deposit account will not be debited, until a designated future date."  12 C.F.R. pt.

1026, Supp. I, Paragraph 2(a)(14) Credit, ¶ 2 ("Payday loans; deferred presentment").

Plaintiffs' conclusory statement in its Opposition that "Omni is a payday lender," [Dkt.

No. 58-1] at 13, does not cure the failure of the Amended Complaint to allege that Omni is a

creditor as defined by the relevant regulation because a plaintiff cannot amend a complaint in a

memorandum responding to a motion to dismiss.  Moreover, plaintiffs have not pointed to any

factual allegations in the Amended Complaint supporting a conclusion that Omni is engaged in

payday lending or deferred presentment transactions.[12]  When they filed their Amended

Complaint, plaintiffs were certainly aware of the relevant definition of a creditor because

defendant's motion to dismiss the original complaint pointed out that 32 C.F.R. § 232.8(a)

supplied the relevant definition of a creditor.  Although plaintiffs were permitted to replead all

---

[12] To define "payday loan," Omni points to a page on the CFPB's website that answers questions
about the Payday Lending Rule, 12 C.F.R. pt. 1041.  See Consumer Finance Protection Bureau,
Payday Lending Rule FAQs, https://www.consumerfinance.gov/compliance/compliance-
resources/consumer-lending-resources/payday-lending-rule/payday-lending-rule-faqs.  The
Payday Lending Rule provides, in relevant part, that a payday loan includes a loan involving a
"cost of credit . . . exceed[ing] 36 percent per annum" and a "leveraged payment mechanism,"
defined as a "right to initiate a transfer of money, through any means, from a consumer's account
to satisfy an obligation on a loan," excluding "a single immediate payment transfer at the
consumer's request."  12 C.F.R. §§ 1041.3(b), (c).  Omni provides no source or authority
justifying its reliance on nonbinding guidance from the CFPB for the definition of a payday loan.

their claims by filing an Amended Complaint,[13] they failed to adequately allege that Omni is a

creditor within the meaning of § 232.8(a).  For these reasons, the Amended Complaint fails to

state a claim for a violation of 10 U.S.C. § 987(e)(1), and defendant's Motion to Dismiss for

Failure to State a Claim will be granted as to Count II of the Amended Complaint.

**E.  <u>Allotment Claim (Count III)</u>**

As to the remaining two loans within the statute of limitation for Count III, Wood's

September 8, 2021 and April 8, 2022 loans, defendant argues the Amended Complaint fails to

state a violation of 10 U.S.C. § 987(e)(6), which prohibits "requir[ing] as a condition for the

extension of credit that the borrower establish an allotment to repay an obligation."

The Amended Complaint alleges that for these two loans, which were obtained after

Omni changed its lending practices in response to the CFPB's investigation, Omni required

Wood to select one of two repayment options: repayment by allotment or repayment by

preauthorized electronic fund transfer using the bank account where the military direct deposits

her monthly pay, which is listed on her Leave and Earnings Statement.  [Dkt. No. 39] ¶¶ 188-89.

The Amended Complaint alleges that Omni's "fail[ure] to provide other methods of repayment"

constituted a violation of 10 U.S.C. § 987(e)(6). <u>Id.</u> ¶ 197.

Omni argues that the Amended Complaint does not state a violation of § 987(e)(6) as to

the September 8, 2021 and April 8, 2022 loans because repayment by allotment was not a

condition for loan approval, pointing out that Wood was given multiple options for repayment.

---

[13] At the hearing on defendant's motion to dismiss the original Complaint, the Court found the Roll Over Claim plausible and did not specifically address defendant's argument that the narrow definition of a "creditor" in 32 C.F.R. § 232.8(a) was not adequately pleaded; however, upon further consideration, the Court finds that the Amended Complaint does not sufficiently allege that Omni is a creditor subject to the roll over prohibition because it fails to allege that Omni is engaged in deferred presentment or payday loan transactions.

The Repayment Agreements for the two loans provide that "[b]orrower understands and agrees that borrower may repay the loan by check, money order, military allotment or other lawful means, or borrower may optionally chose the convenience of having monthly loan payments transmitted to lender by EFT." [Dkt. No. 45-6] at 2, 4.  Directly below that sentence in both Repayment Agreements, an option to repay by "Optional Recurring EFT Payments" is marked with an "X" and includes an additional disclosure that "[r]epaying by EFT is not a condition for approval of the Loan." Id.

April 8, 2022 Loan Repayment Agreement Excerpt

**REPAYMENT OF LOAN:** BORROWER UNDERSTANDS AND AGREES THAT BORROWER MAY REPAY THE LOAN BY CHECK, MONEY ORDER, MILITARY ALLOTMENT OR OTHER LAWFUL MEANS, OR BORROWER MAY OPTIONALLY CHOOSE THE CONVENIENCE OF HAVING MONTHLY LOAN PAYMENTS TRANSMITTED TO LENDER BY EFT.

[X] **Optional Recurring EFT Payments: Repaying by EFT is not a condition for approval of the Loan.** By checking this box and signing below, Borrower elects to repay the Loan by automatic recurring EFTs. Borrower acknowledges that the repayment of the Loan by EFT is an option that has been offered to Borrower for Borrower's convenience. The Depositor authorizes Lender to withdraw funds from the Deposit Account for the regularly scheduled loan payments according to the Payment Schedule as defined above. Depositor understands and agrees that at Lender's option, payments may be executed on a previous or subsequent business day preceding or following the payment due date in order to coincide with Depositor's end of month pay date, in which case the payment will be credited to the Borrower's Loan on the earlier of the date of execution or the regularly scheduled monthly payment due date. If the payment amount changes from the preauthorized amount or the previous withdrawal amount, the Depositor will receive notice from Lender at least 10 days prior to the payment being collected. If the outstanding balance Borrower owes on the Loan is less than the payment amount stated above, Depositor understands and agrees that the final payment will be an amount equal to the total outstanding balance of the Loan.

Id. at 4.

Omni correctly points out that Wood opted to repay the two loans by electronic fund transfer, which is not a military allotment and therefore this repayment option does not violate § 987(e)(6).  When asked during oral argument how these two loans were paid, plaintiffs' counsel conceded that they were paid by electronic fund transfers.  A military allotment is an authorized deduction from a service member's pay, which is effected "before [their] paychecks are deposited into their bank accounts." [Dkt. No. 39] ¶ 73; see General Provisions Governing Allotments of Pay (Other than Child and Spousal Support Allotments Required by Law), Department of Defense Financial Management Regulation, DOD 7000.14-R, vol. 7A, ch. 40. Electronic fund transfers are defined as a "transfer of funds . . . initiated through an electronic terminal, telephonic instrument, or computer . . . so as to order, instruct, or authorize a financial

institution to debit or credit an account." 15 U.S.C. § 1693a(7).  Whereas conditioning a loan on

repayment by military allotment is prohibited by the MLA, conditioning a loan on repayment by

preauthorized electronic fund transfer is prohibited by the Electronic Fund Transfer Act.  See 15

U.S.C. § 1639k(1) (making it unlawful to "condition the extension of credit to a consumer on

such consumer's repayment by means of preauthorized electronic fund transfers").[14]  Therefore,

because Wood's last two loans involved alleged mandatory electronic fund transfers and not

military allotments, Count III of the Amended Complaint does not state a violation of the MLA.

Plaintiffs' counsel should have been fully aware of this distinction because the CFPB recognized

the difference between repayment by electronic fund transfer and military pay allotment, finding

that Omni's pre-December 2020 lending practices with respect to allotments violated the MLA

while its practices with respect to electronic fund transfers violated the Electronic Fund Transfer

Act.  See CFPB Consent Order ¶¶ 6-20.

After being asked by the Court during oral argument why these loans were not covered

by the Electronic Fund Transfer Act, plaintiffs' counsel first responded that Omni's electronic

fund transfer mechanism amounts to a security interest that violates 10 U.S.C. § 987(e)(5);

however, after acknowledging that Wood's last two loans did not involve repayment by

allotment, counsel ultimately admitted that she lacked an appropriate plaintiff for the Allotment

Claim.  For these reasons, Count III fails to allege a violation of the MLA's prohibition on

mandatory repayment by allotment with respect to the September 8, 2021 and April 8, 2022

---

[14] In contrast to the MLA, the Electronic Fund Transfer Act contains a one-year statute of
limitations that begins to run from the "date of the occurrence of the violation," 15 U.S.C.
§ 1693m(g), which would bar an Electronic Fund Transfer Act claim based on Wood's
September 8, 2021 loan.

loans, and therefore the Motion to Dismiss for Failure to State a Claim will be granted as to Count III.

### F. Security Interest Claim (Count IV)

As for Count IV, defendant contends that the Amended Complaint does not adequately allege a violation of 10 U.S.C. § 987(e)(5) for Wood's September 8, 2021 and April 8, 2022 loans. Section 987(e)(5) prohibits a creditor from "us[ing] a check or other method of access to a deposit, savings, or other financial account maintained by the borrower, or the title of a vehicle as security for the obligation." The corresponding regulation provides that 10 U.S.C. § 987 makes it unlawful for a creditor to extend consumer credit with respect to which

> [t]he creditor uses a check or other method of access to a deposit, savings, or other financial account maintained by the covered borrower, except that, in connection with a consumer credit transaction with an MAPR consistent with § 232.4(b) [meaning the MAPR does not exceed 36%], the creditor may:
>
>> (1) Require an electronic fund transfer to repay a consumer credit transaction, unless otherwise prohibited by law;
>>
>> (2) Require direct deposit of the consumer's salary as a condition of eligibility for consumer credit, unless otherwise prohibited by law; or
>>
>> (3) If not otherwise prohibited by applicable law, take a security interest in funds deposited after the extension of credit in an account established in connection with the consumer credit transaction.

32 C.F.R. § 232.8(e).

The Amended Complaint alleges that Omni required plaintiffs to grant it a security interest in the bank accounts into which their military pay was deposited each month. Specifically, the Amended Complaint alleges that plaintiffs were required to give Omni a copy of their end of month Leave and Earnings Statements, which identified the bank accounts in which their monthly pay was deposited. The Amended Complaint further alleges that Omni required plaintiffs to use "that same bank account for a preauthorized electronic fund transfer"

and to certify that they are an "owner of or authorized signed [sic] for the Deposit Account and .

. . will not dispute payments debited from the Deposit Account." [Dkt. No. 39] ¶¶ 81, 204-07.

Plaintiffs argue that Omni's conduct amounts to taking a security interest because Omni obtains

"direct and unfettered" access to plaintiffs' bank accounts and bars plaintiffs' ability to challenge

withdrawals. [Dkt. No. 58-1] at 16. As plaintiffs point out, the loan documents for Wood's

September 8, 2021 and April 8, 2022 loans disclose the existence of a security interest in the

bank account identified in the Repayment Agreement. See [Dkt. No. 45-1] at 8, 9.

Although these alleged practices may constitute "us[ing] a check or other method of

access to a deposit, savings, or other financial account" as security for the obligation, 10 U.S.C.

§ 987(e)(5), because they enable Omni to use the borrower's account information to collect

payments on the outstanding loan to ensure repayment of the obligation, the corresponding

regulations provide that if the MAPR does not exceed 36%, a creditor is permitted to "[r]equire

an electronic fund transfer to repay a consumer credit transaction" or "[r]equire direct deposit of

the consumer's salary," unless otherwise prohibited by law. 32 C.F.R. § 232.8(e).[15] Thus,

Omni's alleged practices, which amount to a preauthorized electronic fund transfer from the

---

[15] Although the Department of Defense's interpretive guidance does not necessarily control, see
Davidson, 65 F.4th at 128 n.6, it supports this interpretation of the regulation as it explains that
§ 232.8(e) "does not prohibit a covered borrower from authorizing automatically recurring
payments, provided that such recurring payments comply with other laws, such as the Electronic
Fund Transfer Act and its implementing regulations, including 12 C.F.R. 1005.10, as
applicable." 81 Fed. Reg. 58,840, 58,844 (Aug. 26, 2016). The interpretive guidance
additionally provides that § 232.8(e) "does not prohibit covered borrowers from granting a
security interest to a creditor in the covered borrower's checking, savings, or other financial
account, provided that it is not otherwise prohibited by other applicable law and the creditor
complies with all other provisions of the MLA regulation, including the limitation on the MAPR
to 36 percent." 82 Fed. Reg. 58,739, 58,740-41 (Dec. 14, 2017). Rather, it "prohibits a creditor
from using the borrower's account information to create a remotely created check or remotely
created payment order in order to collect payments on consumer credit from a covered borrower
or using a post-dated check provided at or around the time credit is extended." Id.

bank account in which the borrower's military pay is deposited, do not run afoul of the MLA if the loans do not exceed a 36% MAPR and otherwise comply with federal law.

Consistent with the MLA and its regulations, the Amended Complaint recognizes that a MAPR of 36% is a requirement of Count IV as it states that "[i]t is unlawful under the MLA to take a security interest in an installment loan that exceeds 36% MAPR," [Dkt. No. 39] ¶ 212, and "[t]he Security Interest Class is viable where any Omni loan exceeds 36% MAPR and Omni takes a security interest," id. ¶ 214. Nevertheless, in their Opposition, plaintiffs do not address 32 C.F.R. § 232.8(e) and do not attempt to explain how Omni's purported security interest is prohibited under those regulations. Moreover, plaintiffs voluntarily dismissed their claim that Omni's loans exceeded a 36% MAPR as a strategic decision, ostensibly to avoid what they described as the expert battle involved in calculating the MAPR and to focus instead on the remaining claims in the Amended Complaint. See [Dkt. No. 53] ¶¶ 6-9. Because a creditor is not prohibited from taking a security interest in the form of accessing a bank account by way of preauthorized electronic fund transfer so long as the MAPR does not exceed 36%, and plaintiffs dismissed the MAPR claim and do not otherwise address § 232.8(e), the security interest claim fails and Omni's Motion to Dismiss for Failure to State a Claim will be granted as to Count IV.

### III. CONCLUSION

In sum, defendant's Motion to Dismiss for Failure to State a Claim will be granted because all but two of plaintiffs' loans are time-barred, and for those two loans, the Amended Complaint does not allege a plausible claim for relief. At oral argument, plaintiffs' counsel urged the Court not to dismiss the Amended Complaint, pleading that they be afforded an opportunity to obtain relief for their clients who are stuck in a debt trap. The Court recognizes that the MLA serves an important purpose in protecting service members from predatory lending

practices and that plaintiffs seek to further the statute's protections and obtain relief for similarly

situated service members, particularly on the heels of the CFPB's investigation of Omni;

however, plaintiffs already had the benefit of filing an Amended Complaint after being

confronted with an extensive motion to dismiss which raised most of the legal and factual issues

the Amended Complaint was supposed to address.  Plaintiffs' Amended Complaint did not

address many of those issues, and when confronted with them once again in defendants'

subsequent Rule 12(b)(6) motion, plaintiffs' Opposition failed to adequately respond to those

issues.

     A court is not required to give plaintiffs repeated chances to amend when they have been

previously granted leave to amend but failed to address the problems with the pleading.  See

Foman v. Davis, 371 U.S. 178, 182 (1962) (observing that "repeated failure to cure deficiencies

by amendments previously allowed" may justify denying leave to amend).  Moreover, plaintiffs

did not request "leave to amend" until the conclusion of their Opposition memorandum and did

not propose any amendments that would cure the identified deficiencies.  This is not a proper

way to move for leave to amend.  See Willner v. Dimon, 849 F.3d 93, 114 (4th Cir. 2017)

(finding that a district court did not abuse its discretion in denying leave to amend when the

plaintiffs "never filed a formal motion to amend, but rather requested leave to amend in the

conclusions of three oppositions to motions to dismiss and one surreply," and "fail[ed] to provide

the district court with any proposed amended complaint or other indication of the amendments

[they] wishe[d] to make" (internal quotations omitted)); Cozzarelli v. Inspire Pharms. Inc., 549

F.3d 618, 630 (4th Cir. 2008) (finding no abuse of discretion in "declining to grant a motion [to

amend] that was never properly made" but raised only in an opposition to a motion to dismiss

and objections to the magistrate judge's report).

Accordingly, for the reasons stated above and by an Order to be issued with this Memorandum Opinion, defendant's Motion to Dismiss for Lack of Jurisdiction [Dkt. No. 43] will be denied, the Motion to Dismiss for Failure to State a Claim [Dkt. No. 44] will be granted, and the Amended Complaint will be dismissed.

Entered this 31 day of May, 2023.

Alexandria, Virginia

_____/s/_____
Leonie M. Brinkema
United States District Judge

53